UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

Case No. _____

THE STATE OF TEXAS,

    *Plaintiff*,

v.

JOHNSON & JOHNSON, KENVUE, INC.; KENVUE BRANDS LLC (f/k/a JOHNSON & JOHNSON CONSUMER INC.),

    *Defendants*.

## DEFENDANTS' NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants Johnson & Johnson, Kenvue, Inc., and Kenvue Brands LLC, f/k/a Johnson & Johnson Consumer Inc. (collectively, "Defendants") hereby remove this case from the District Court of Panola County, 123rd Judicial District, to the United States District Court for the Eastern District of Texas. This Court has jurisdiction under 28 U.S.C. § 1331 because the allegations in this case give rise to a substantial question of federal law.

1.     This action, brought by the State of Texas, represents an egregious usurpation of federal power with respect to Tylenol—a brand of acetaminophen ("APAP") over-the-counter ("OTC") medications that has been deemed safe and effective by the U.S. Food and Drug Administration ("FDA") since 1955 and has been critical to the treatment of pain and fever in expecting mothers and children. Under the purported auspices of state consumer protection law, Texas effectively seeks unprecedented relief: to prohibit Defendants from marketing and selling Tylenol® throughout the State based on theories of harm that have been broadly rejected in the

scientific community. The State does not point to any new scientific data in support of its demand. Instead, it highlights public statements by HHS Secretary Robert F. Kennedy Jr., which allegedly "confirmed" that use of APAP during pregnancy causes autism spectrum disorder ("ASD") or attention deficit hyperactivity disorder ("ADHD").

2. As set forth more fully below, this case is properly removed to this Court pursuant to 28 U.S.C. § 1331 because the State's claims directly implicate fundamental issues of federal law, including: (1) the import of a statement by a federal public figure challenging the safety of a drug; (2) a state's authority to prohibit the sale and marketing of an FDA-approved medication; and (3) a state's authority to impose liability on a manufacturer for marketing a product bearing a warning that satisfies all requirements mandated by the FDA.

3. In contrast to the HHS Secretary, the FDA, the National Institutes of Health ("NIH"), the American College of Obstetricians and Gynecologists ("ACOG"), the Society for Maternal and Fetal Medicine ("SMFM"), the European Network of Teratology Information Services ("ENTIS"), and the Society of Obstetricians and Gynaecologists of Canada ("SOGC") have all repeatedly determined that the scientific evidence does *not* support the conclusion that maternal use of acetaminophen during pregnancy causes ASD or ADHD in children.

4. In 2023, the FDA issued a statement that "'the limitations and inconsistent findings of current observational studies . . . are unable to support a determination of causality.'" Department of Health & Services, Epidemiology: Review of Published Studies (July 15, 2022) at 3.

5. In May 2025, the FDA found that "[g]iven the inconsistent findings and limitations identified in our current review of observational studies of prenatal [acetaminophen] use with pregnancy, birth, neurobehavioral, developmental and ADD outcomes, the data covered in this

review alone and in combination with previous DEPI literature reviews are insufficient to support a causal association at this time." CDER, Epidemiology: Literature Review of Neurobehavioral, Pregnancy and Birth Outcomes Associated with Prenatal Acetaminophen Exposure (May 27, 2025) at 3.

6. And on August 14, 2025, the FDA maintained this position on its website, explaining: "To date, FDA has not found clear evidence that appropriate use of acetaminophen during pregnancy causes adverse pregnancy, birth, neurobehavioral, or developmental outcomes." https://www.fda.gov/drugs/information-drug-class/acetaminophen.

7. Acetaminophen is *vital* to protecting pregnant women's health because it "is considered the only pain reliever and fever reducer indicated for use during pregnancy because of the risks of miscarriage or birth defects associated with other analgesics like NSAIDS." *In re Acetaminophen-ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 320 (S.D.N.Y. 2023), *appeal filed*; *see also* Department of Health & Human Services, Maternal Health Memorandum (Apr. 7, 2016) at 5 (attached as Ex. A) (cautioning against warning of an unestablished risk of autism or ADHD because it could dissuade women from taking much-needed medication). Indeed, just two months ago, ACOG reaffirmed that "[a]cetaminophen is one of the few options available to pregnant patients to treat pain and fever, which can be harmful to pregnant people when left untreated." "ACOG Affirms Safety and Benefits Of Acetaminophen during Pregnancy," ACOG (Sept. 22, 2025) (attached as Ex. B). The "conditions people use acetaminophen to treat during pregnancy are far more dangerous than any theoretical risks," which is why premier scientific organizations studying the science have concluded that "acetaminophen is essential to the people who need it." *Id.*; *see also* SMFM Statement on Acetaminophen Use During Pregnancy and Autism, SMFM (Sept. 5, 2025) (continuing to advise physicians and patients to prescribe

acetaminophen as "an appropriate medication to treat pain and fever during pregnancy") (attached as Ex. C).

8. Perhaps most importantly, just last year, the NIH reported on the "largest" study to date on this subject, published in the nation's premier medical journal, which found that APAP "exposure during pregnancy is not linked to the risk of developing autism[.]" NIH News Release, *Study reveals no causal link between neurodevelopmental disorders and acetaminophen exposure before birth* (Apr. 11, 2024) (emphasis added). Ahlqvist VH, Sjöqvist H, Dalman C, et al. *Acetaminophen Use During Pregnancy and Children's Risk of Autism, ADHD, and Intellectual Disability*. JAMA. 2024;331(14):1205–1214. doi:10.1001/jama.2024.3172.

9. Despite the unassailable science supporting the safety of acetaminophen use in pregnancy, HHS Secretary Robert F. Kennedy Jr. has recently made inaccurate statements suggesting that the medication is unsafe. Notably, the FDA itself has not echoed Secretary Kennedy's debunked allegations regarding acetaminophen use in pregnancy. Rather, the FDA has taken a more measured approach.

> o On September 22, 2025, FDA Commissioner Martin Makary sent a notice to physicians, which stated: "[W]hile an association between acetaminophen and autism has been described in many studies, <u>a causal relationship has not been established</u> and <u>there are contrary studies in the scientific literature</u>." Notice to Physicians on the Use of Acetaminophen During Pregnancy, Martin A. Makary, M.D., M.P.H., Commissioner of Food and Drugs (Sept. 22, 2025) (attached as Ex. D).

- o   The Commissioner also underscored that "acetaminophen is the <u>safest</u> over-the-counter alternative in pregnancy among all analgesics and antipyretics; aspirin and ibuprofen have well-documented adverse impacts on the fetus." *Id.*

- o   That same day, the FDA initiated a potential labeling change, which stated that "acetaminophen is the <u>only</u> over-the-counter drug approved for use to treat fevers during pregnancy." FDA Responds to Evidence of Possible Association Between Autism and Acetaminophen Use During Pregnancy, FDA News Release (Sep. 22, 2025) (attached as Ex. E).

- o   The HHS Secretary has walked back some of his anti-acetaminophen rhetoric, admitting in a recent press conference that a causal link between acetaminophen and ASD has <u>not</u> been proven and reiterating that HHS's core message to patients has been to consult their physicians, which is the very language on the Tylenol label.

10.   In 2022, an MDL proceeding, *In re Acetaminophen – ASD-ADHD Products Liability Litigation*, MDL No. 3043, was established in the United States District Court for the Southern District of New York (Cote, J.) for coordinated pretrial proceedings of APAP-related actions pursuant to 28 U.S.C. § 1407. That MDL proceeding includes more than 600 cases like this one, alleging that use of acetaminophen during pregnancy causes ASD and ADHD in children. The federal MDL court excluded two epidemiologists who sought to testify that APAP exposure causes ASD and ADHD, effectively ending that litigation. *See In re Acetaminophen-ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 331, 334 (S.D.N.Y. 2023), *appeal filed.*

11.   Plaintiffs' counsel in the unsuccessful Tylenol litigation have not backed down. Having failed to persuade the FDA, the broader scientific community, and (most recently) a federal

judge, they have now teamed up with the Texas AG, seeking to leverage recent unfounded statements by Secretary Kennedy into an attack on Tylenol.

12.     The Texas AG's lawsuit is essentially a two-pronged challenge. First, Plaintiff alleges that Defendants violated the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") by marketing Tylenol as safe and failing to disclose the purported risk of autism and ADHD. Pet. ¶¶ 1-2. The State seeks broad injunctive relief that (if granted) would effectively enjoin Defendants from selling the product in Texas. *Id.* ¶ 189(a). Plaintiff also seeks civil penalties in the amount of $10,000 per violation, which is presumably intended to mean each sale of the medication in the state. *Id.* ¶ 189(c).

13.     Second, Texas alleges that Johnson & Johnson violated the Uniform Fraudulent Transfer Act by spinning off its consumer division in a purported attempt to avoid litigation related to Tylenol. *Id.* ¶¶ 13-15. The State seeks an order attaching the assets of Johnson & Johnson, as well as an injunction barring Defendants from "disposing" of corporate assets. *Id.* ¶ 189(e)-(f).

14.     Pursuant to 28 U.S.C. § 1331 and 1446, Defendants hereby remove this case from Panola County District Court, 123rd Judicial District, to the United States District Court for the Eastern District of Texas.

15.     Pursuant to 28 U.S.C. § 1446(a), copies of all documents currently in the state court file are attached hereto.

## THE PARTIES

16.     Plaintiff is the State of Texas. *See* Pet. ¶ 18.

17.     Defendant Johnson & Johnson is incorporated under the laws of the state of New Jersey, and has its principal place of business in New Jersey. *See id.* ¶ 20. Accordingly, Johnson & Johnson is a citizen of the state of New Jersey.

6

18. Defendants Kenvue Inc. and Kenvue Brands LLC are incorporated under the laws of the state of Delaware and have their principal places of business in New Jersey. *See id.* ¶¶ 21-22. Accordingly, Kenvue Inc. and Kenvue Brands LLC are citizens of the states of Delaware and New Jersey.

## REMOVAL IS PROPER BECAUSE THIS COURT HAS FEDERAL QUESTION JURISDICTION OVER THIS MATTER.

19. Under 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." A "longstanding . . . variety of federal 'arising under' jurisdiction" is when state-law claims "implicate significant federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). The Supreme Court has recognized this category of federal-question jurisdiction "for nearly 100 years." *Id.*

20. In determining whether claims arise under federal law, courts do not rely merely on the names or nature of the causes of action asserted by the plaintiff. Rather, under *Grable*, substantial federal question jurisdiction exists over a state-law claim if four requirements are satisfied: (1) the claim "necessarily" raises a federal issue; (2) the federal issue is actually disputed; (3) the federal issue is "substantial"; and (4) the exercise of federal jurisdiction over that issue will not unsettle the federal-state balance of judicial power that Congress sought to create. *See id.* As set forth below, each of these requirements is plainly satisfied here.

21. ***First***, "[t]he resolution of [Texas's] claims necessarily depends on decisive federal questions" related to the comprehensive federal regulatory oversight of acetaminophen by the FDA. *See In re Zyprexa Prods. Liab. Litig.*, Nos. 04-MD-1596, 07-CV_1933(JBW), 2008 WL 398378, at *1 (E.D.N.Y. Feb. 12, 2008) (denying motion to remand Montana action arising out of off-label marketing given "[t]he FDA's responsibility to regulate prescription drugs and to enforce

7

laws with respect to such drugs"); *see also, e.g., id.* (similar with respect to lawsuit brought by New Mexico); *Montgomery v. Medtronic Sofamor Danek USA, Inc.*, No. 2:14-cv-02212-JTF-cgc, 2014 U.S. Dist. LEXIS 196618, at *20-21 (W.D. Tenn. June 26, 2014) (central allegation that defendant engaged in off-label marketing of device "necessarily raise[s] disputed federal issues"); *H.R. Medtronic, Inc.*, 996 F. Supp. 2d 671, 679 (S.D. Ohio 2014) ("Plaintiffs' claims clearly implicate federal law" where they are based on allegations that defendants improperly promoted and sold a medical device in a manner inconsistent with the FDA's approval of the product).

22.     Most fundamentally, the Texas AG grounds his claims in an appeal to federal authority, asserting that "***the federal government*** confirmed . . . [that] acetaminophen use during pregnancy likely causes conditions like ASD and ADHD." Pet. at 2 (citing Press Release, FDA, FDA Responds to Evidence of Possible Association Between Autism and Acetaminophen Use During Pregnancy (Sept. 22, 2025)). The plain implication is that the federal government's evaluation of acetaminophen's risk/benefit profile under the federal regulatory framework that governs OTC drugs is decisive on the merits of Plaintiff's claims. And even related issues—such as the notion that an agency press release could constitute final government action—themselves pose federal questions.[1]

23.     Subsequent allegations in the Petition only cement the primacy of federal issues. Plaintiff premises its assertions, for example, on the theory that "Defendants had the authority and

---

[1]     The State AG distorts the press release, which merely noted that certain (but not all) studies have reported "a correlation between acetaminophen use during pregnancy and subsequent diagnosis of conditions like autism and ADHD." Press Release. As the press release stresses, "[i]t is important to note that while an association between acetaminophen and neurological conditions has been described in many studies, a causal relationship has not been established and there are contrary studies in the scientific literature." *Id.* The same press release reiterates "that acetaminophen is the only over-the-counter drug approved for use to treat fevers during pregnancy, and high fevers in pregnant women can pose a risk to their children." *Id.*

the duty to change the warning labels of Tylenol products based on . . . significant scientific evidence[.]" Pet. ¶ 10. But that squarely puts at issue the question whether, as a matter of the federal regulatory framework, Defendants indeed "had the authority" to change warning labels because, as the Petition expressly acknowledges, Tylenol® is "regulated by the [federal] Food and Drug Administration[.]" Pet. ¶ 8. Indeed, the FDA's regulations speak directly to this question, requiring manufacturers to use the "exact language" prescribed by the FDA in OTC monographs and regulations. 21 C.F.R § 330.1(c)(2). Both are implicated here because the FDA has an operative final monograph that applies to acetaminophen and dictates the contents of its label, Final Administrative Orders for Over-the-Counter Monographs; Availability, 86 Fed. Reg. 52,474, 52,47576 (Sept. 21, 2021), and FDA regulations mandate a uniform national pregnancy warning ("Pregnancy Warning") for all OTC medications like Tylenol, 21 C.F.R. § 201.63(a). No manufacturer or marketer of APAP may unilaterally alter this language; nor may a state require them to do so. Indeed, failure to include the FDA-approved warning verbatim renders a drug per se misbranded as a matter of federal law. *See* 21 U.S.C. § 352(ee) (deeming a drug that fails to do so "misbranded").

24. Although the standard Pregnancy Warning is general in nature, the path to a more specific warning is not to have a jury, acting as an instrument of state law, require the manufacturer to add such a warning unilaterally. Instead, the FDA can "establish[]" a specific warning and if it does so, "the specific warning shall be used in place of" the ordinary one "unless otherwise stated[.]" 21 C.F.R. § 201.63(b). The FDA has not established any such specific warning here. Rather, as the Petition recognizes, the Department of Health and Human Services only recently

9

"initiate[d] a safety label change" to explore the possibility of requiring a more specific warning to the Tylenol labeling. Pet. ¶ 149.[2]

25. The Petition will require the resolution of other inherently federal questions as well. For example, the Petition invokes the FDA's initiation of a process for updating labeling requirements for acetaminophen, Pet. ¶ 149—an issue that is being hotly contested before the FDA itself and alleged to be arbitrary and capricious under the Administrative Procedures Act. Even issues related to the coordination of judicial and administrative proceedings addressing similar subject matters raise federal questions concerning the separation of powers and primary jurisdiction.

26. *Second*, the federal issues raised by this case are clearly "disputed"—*Grable*'s second requirement. As already discussed, Plaintiff contends that Defendants "had the authority and the duty to change the warning labels of Tylenol products." Pet. ¶ 8. However, Defendants never possessed that authority, particularly not after the passage of the CARES Act in 2020, which made explicit that, if a company wishes to use a drug label that "deviate[s] in any respect from a monograph that has become final," it must file an NDA subject to plenary FDA review, 21 C.F.R. § 330.11, or request that the FDA change the monograph, *see* 21 U.S.C. § 355h(b)(5).

27. *Third*, *Grable*'s third requirement is also satisfied because the federal questions necessarily raised in this case are not only disputed, but "substantial." *See H.R.*, 996 F. Supp. 2d at 680 (requirement met because the case "present[s] important federal questions about federal regulation of Class-III medical devices"); *see also In re Zyprexa*, 2009 WL 691942, at *3 ("There are controlling federal questions in the resolution of New Mexico's Medicaid claims and in state

---

[2] Notably, the agency has not provided any further information about this process, including the timing of any final decision, much less what (if any) changes would be made to the label.

law claims against Lilly."). Not only does Texas seek to hold Defendants liable for past marketing of a medication that followed the FDA's mandated Pregnancy Warning to the letter; it seeks to enjoin Defendants from "manufacturing, distributing, advertising, or selling Tylenol in Texas[.]" Pet. ¶ 189.

28. Effectively banning Tylenol from being marketed and sold in Texas—the second most populous state—would wreak havoc on the health of pregnant women. The Petition expressly acknowledges that "acetaminophen is estimated to be used by up to 65% of women during pregnancy." Pet. ¶ 38. That is unsurprising because, as noted above, APAP is the only pain reliever and fever reducer available for pregnant women given that other analgesics cause miscarriages and birth defects. *See In re Acetaminophen-ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 320 (S.D.N.Y. 2023), *appeal filed*.

29. Of note, the State has now moved for a temporary restraining order and temporary injunction to immediately effectuate both the relief sought in the Petition and additional relief that would ensure Tylenol cannot be sold in Texas. Thus, absent removal, an untold number of pregnant women in Texas will immediately be denied access to a critical medication, the safety and efficacy of which has repeatedly been upheld by the FDA.

30. *Fourth*, exercising jurisdiction will not "disturb[] any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. Rather, it will have precisely the opposite effect, reinforcing the primacy of the federal government as to disclosures in the Tylenol label. *See Montgomery*, 2014 U.S. Dist. LEXIS 196618, at *27 (because "[t]he regulations and requirements of the safety and effectiveness" of medical devices "belong under the scope of federal question jurisdiction," "the Court believes that the state-federal jurisdictional balance remains untouched by the conferral of federal jurisdiction over Plaintiff's claims").

31. Moreover, Defendants intend to seek transfer of this case to the federal court overseeing numerous other lawsuits involving similar claims challenging the safety of APAP. As a result, exercising jurisdiction will promote "judicial efficiency" and avoid inconsistent rulings on the fundamental federal issues raised in this case. *See In re Zyprexa*, 2008 WL 398378, at *6 ("At issue here is not simply a federal drug standard, but the factor of an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation.").

**ALL PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN MET**

32. Venue is proper pursuant to 28 U.S.C. § 1441(a) as this is the federal district court for the district embracing the place where the state court suit is pending.[3]

33. Plaintiff's Petition was served on Kenvue and Kenvue Brands on November 4, 2025. Johnson & Johnson has not been served. Accordingly, this Notice of Removal is timely filed.

34. In filing this Notice of Removal, Defendants do not waive and expressly reserve any defenses available to them, including any challenge to venue in the event this case is ultimately remanded to state court.

35. By removing this action from Panola County District Court, Defendants do not admit any of the allegations in Plaintiff's Petition.

36. As required by 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon Plaintiff, by and through its attorney of record, and is being filed with the Clerk of the Panola County District Court Clerk's Office.

---

[3] Following removal, Defendants anticipate noticing this case as a tag-along action to *In re Acetaminophen—ASD-ADHD Products Liability Litigation*, No. 22-MD-3043 (DLC), pending in the U.S. District Court for the Southern District of New York.

WHEREFORE, Defendants file this Notice of Removal so that the entire state court action under Case No. 2025-348 now pending in the District Court of Panola County, 123rd Judicial District, State of Texas, be removed to this Court for all further proceedings.

Dated: November 6, 2025                    Respectfully submitted,

                                                               **KIRKLAND & ELLIS, LLP**

                                                               /s/ *Kim Bueno*
                                                               Kim Bueno, P.C.
                                                               State Bar No. 24065345
                                                               401 W. 4th Street
                                                               Austin, TX 78701
                                                               Tel: (512) 678-9100
                                                               Email: kim.bueno@kirkland.com

                                                               ***Counsel for Defendants***

**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on this 6th day of November, 2025, I caused a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to any counsel of record.

/s/ *Kim Bueno*
Kim Bueno, P.C.