# EXHIBIT A

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

**IN RE:** Acetaminophen – ASD/ADHD

Products Liability Litigation                                    MDL No.  3043

**NOTICE OF POTENTIAL TAG-ALONG ACTION**

In accordance with Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation defendant Kenvue Brands LLC, formerly known as Johnson & Johnson Consumer Inc., writes to notify you of the potential tag along action listed on the attached Schedule of Action.

Docket sheet and complaint is attached.

Dated: November 6, 2025

Sincerely,

*/s/ James F. Murdica*
James F. Murdica
**BARNES & THORNBURG LLP**
390 Madison Avenue, 12th Floor
New York, New York 10017
T: 646-746-2035
F: 646-746-2001
JMurdica@btlaw.com

*Attorneys for Defendant Kenvue Brands LLC,
formerly known as Johnson & Johnson
Consumer Inc.*

**IN RE:** Acetaminophen – ASD/ADHD

Products Liability Litigation                                                          MDL No.  3043

### NOTICE OF POTENTIAL TAG-ALONG ACTION

|    | Plaintiff | Defendants | District | Civil Action No. | Judge |
|----|-----------|------------|----------|------------------|-------|
| 1. | The State of Texas | Johnson & Johnson Kenvue Inc. Kenvue Brands LLC (f/k/a Johnson & Johnson Consumer Inc.) | E.D. Tex. | 6:25-cv-442 | Unassigned |

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE: ACETAMINOPHEN –
ASD/ADHD PRODUCT LIABILITY
LITIGATION

MDL DOCKET NO. 3043

## PROOF OF SERVICE

I hereby certify that a copy of the foregoing Notice of Potential Tag Along Action by Defendant Kenvue Brands LLC, formerly known as Johnson & Johnson Consumer Inc., with its Schedule of Action and attachment, and this Proof of Service was served electronically and notice of the service of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system. For any parties not registered to receive service in this matter via the Court's electronic filing system, service is made to the following via electronic mail or via U.S. Mail where electronic mail is unavailable:

**Case No. 6:25-cv-442**

**Counsel for the State of Texas**
*Served via electronic mail*

**OFFICE OF THE TEXAS
ATTORNEY GENERAL**
Ken Paxton
Brent Webster
Ralph Molina
Austin Kinghorn
Ryan Walters
Johnathan Stone
Jerry Bergman
Kelley Owens
Consumer Protection Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711
Telephone: (512) 463-2185
Fax: (512) 473-8301
Johnathan.Stone@oag.texas.gov
Jerry.Bergman@oag.texas.gov
Kelley.Owens@oag.texas.gov

**Defendant Johnson & Johnson**
*Served via U.S. Mail*

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

**Defendant Kenvue, Inc.**
*Served via U.S. Mail*

Kenvue, Inc.
One Kenvue Way
Summit, New Jersey 07901

**KELLER POSTMAN LLC**
Ashley C. Keller
150 N. Riverside Plaza Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
ack@kellerpostman.com

John J. Snidow
John M. Masslon II
Roseann R. Romano
1101 Connecticut Ave. NW Suite 1100
Washington, DC 20036
Telephone: (202) 918-1123
jj.snidow@kellerpostman.com
john.masslon@kellerpostman.com
roseann.romano@kellerpostman.com

Dated: November 6, 2025

Respectfully submitted,

*/s/ James F. Murdica*
James F. Murdica
**BARNES & THORNBURG LLP**
390 Madison Ave, 12th Floor
New York, New York 10017
T: 646-746-2035
F: 646-746-2001
JMurdica@btlaw.com

*Attorneys for Defendant Kenvue Brands
LLC, formerly known as Johnson & Johnson
Consumer Inc.*

# U.S. District Court
## Eastern District of TEXAS [LIVE] (Tyler)
## CIVIL DOCKET FOR CASE #: 6:25-cv-00442

The State of Texas v. Johnson & Johnson et al

Assigned to:

Cause: 28:1446pl Petition for Removal - Product Liability

Date Filed: 11/06/2025

Jury Demand: None

Nature of Suit: 890 Other Statutory Actions

Jurisdiction: Federal Question

**Plaintiff**

**The State of Texas**
represented by **The State of Texas**
PRO SE

V.

**Defendant**

**Johnson & Johnson**
represented by **Kimberly Gustafson Bueno**
Kirkland & Ellis
400 Congress Ave
Austin, TX 78701
512-355-4390
Email: kim.bueno@kirkland.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kenvue, Inc.**
represented by **Kimberly Gustafson Bueno**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kenvue Brands LLC**
*f/k/a Johnson & Johnson Consumer Inc.*
represented by **Kimberly Gustafson Bueno**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/06/2025 | 1 | NOTICE OF REMOVAL by Kenvue Brands LLC, Kenvue, Inc., Johnson & Johnson from District Court of Panola County, 123rd Judicial District, case number 2025-348. (Filing fee $ 405 receipt number ATXEDC-11192308), filed by Kenvue Brands LLC, Kenvue, Inc., Johnson & Johnson. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit G-1, # 10 Exhibit G-2, # 11 Exhibit G-3, # 12 Exhibit G-4, # 13 Exhibit G-5, # 14 Exhibit G-6, # 15 Exhibit G-7, # 16 Exhibit G-8, # 17 Exhibit G-9, # 18 Exhibit G-10, # 19 Exhibit G-11, # 20 Exhibit G-12, # 21 Exhibit G-13, # 22 Exhibit G-14, # 23 Exhibit G-15, # 24 Exhibit G-16, # 25 Exhibit G-17, # 26 Exhibit G-18, # 27 Exhibit G-19)(Bueno, Kimberly) (Entered: 11/06/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/06/2025 20:28:51 | | | |
| **PACER Login:** | MurdicaJ | **Client Code:** | 66666.6 |
| **Description:** | Docket Report | **Search Criteria:** | 6:25-cv-00442 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Filed 10/27/2025 10:16 PM
Lindsey Smith, District Clerk
Panola County, Texas
By: Lora Brown,
Deputy Clerk
2025-348

CAUSE NO. <u>2025-348</u>

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| v. | § | |
| | § | |
| JOHNSON & JOHNSON; KENVUE, | § | PANOLA COUNTY, TEXAS |
| INC.; KENVUE BRANDS LLC (f/k/a | § | |
| JOHNSON & JOHNSON CONSUMER | § | |
| INC., | § | |
| | § | |
| *Defendants.* | § | <u>123RD</u> JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

For decades, Defendants JOHNSON & JOHNSON, KENVUE, INC., and KENVUE BRANDS LLC (f/k/a JOHNSON & JOHNSON CONSUMER INC.) knew that acetaminophen—Tylenol′s active ingredient—is dangerous to unborn children and young children. Yet they hid this danger and deceptively marketed Tylenol as the only safe painkiller for pregnant women, violating the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 et seq. ("DTPA").

As mounting scientific evidence linked prenatal and early-childhood exposure to acetaminophen with Autism Spectrum Disorder (″ASD″) and Attention-Deficit Hyperactivity Disorder (″ADHD″), Johnson & Johnson saw a reckoning on the horizon. Rather than take responsibility, Johnson & Johnson fraudulently transferred its Tylenol-related liabilities to Kenvue, Inc. and Kenvue Brands LLC (together, "Kenvue")—in violation of the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.001 et seq. ("UFTA")—to shield its ill-gotten assets from the families they harmed.

Copy from re:SearchTX

The reckoning has arrived. Last month, the federal government confirmed what Defendants knew for years: acetaminophen use during pregnancy likely causes conditions like ASD and ADHD.[1] Given how widely acetaminophen is used and how prevalent these conditions are, Defendants face tens of billions of dollars in damages to permanently injured children. Because of their fraudulent transfer, there may be insufficient funds to compensate Texas victims.

The Attorney General brings this suit on behalf of the State and respectfully shows the following:

## INTRODUCTION

1.      For decades, Defendants have willfully ignored and attempted to silence the science that prenatal and early-childhood exposure to their acetaminophen (also known as paracetamol or APAP) products can cause ASD and ADHD in children. The Tylenol labels on these products contain no warning that there is any risk of ASD or ADHD if a woman ingests the drug while pregnant. Rather, Defendants have marketed the drug as a completely safe pain medication for pregnant women and children. This campaign has been effective, as approximately 65% of pregnant women take some form of acetaminophen while pregnant, and most do so for minor aches and pains.

2.      Defendants have sold Tylenol and reaped the benefits of its sales. Pregnant women rely on Defendants and their safety assurances when they purchase Tylenol. Defendants owed a duty to Texas consumers to warn about the risks of prenatal ingestion of acetaminophen.

---

[1]     Press Release, FDA, FDA Responds to Evidence of Possible Association Between Autism and Acetaminophen Use During Pregnancy (Sept. 22, 2025), https://www.fda.gov/news-events/press-announcements/fda-responds-evidence-possible-association-between-autism-and-acetaminophen-use-during-pregnancy [https://perma.cc/R2X8-Z3YB].

Copy from re:SearchTX

3.      Defendants, however, have shunned this duty and willfully ignored the science that prenatal exposure to acetaminophen can cause ASD and ADHD in children. The labels for Tylenol products contain no warning that there is any sort of risk of ASD or ADHD if a woman ingests the drug while pregnant or if young children take the drug. Pregnant women have purchased and taken Tylenol products based on the understanding that these products posed no risk to their unborn children.

4.      But acetaminophen, the sole active ingredient of the Tylenol products at issue here, can cause ASD and ADHD in children when they ingest the drug or when their mothers ingested the drug while pregnant. To date, at least twenty-six epidemiological studies have shown positive associations between prenatal use of acetaminophen and ASD and/or ADHD. Six studies have investigated whether there is a dose-response relationship between prenatal acetaminophen exposure and ADHD. Two focused on ASD. *All eight* showed a dose-response relationship.

5.      Scientists employed strict methodologies to account for certain limitations associated with observational studies. For example, a common limitation of observational studies is that they rely on patients to self-report their exposure to the drug in question, which creates a risk of recall bias. To control for this, one peer-reviewed study examined maternal umbilical cord blood samples to assess acetaminophen levels.[2] The study stratified the results into tertiles to evaluate the risk of various levels of exposure. The results showed that women with children in the top tertile of acetaminophen levels, compared to those in the lowest tertile, suffered a 3.62 times increased risk of giving birth to a child later diagnosed with ASD and a 2.86 times increased risk of giving birth to a child later diagnosed with ADHD.

---

[2]      Yuelong Ji et al., *Association of Cord Plasma Biomarkers of In Utero Acetaminophen Exposure With Risk of Attention-Deficit/Hyperactivity Disorder and Autism Spectrum Disorder in Childhood*, 77 JAMA Psychiatry 180 (2020).

Copy from re:SearchTX

6.     The scientific evidence spurred over ninety scientists to sign a consensus statement issued in September 2021 about the relationship between prenatal use of acetaminophen and ASD and ADHD. It is unusual for such a broad coalition of scientific experts to sign a single statement. The authors concluded that "the combined weight of animal and human scientific evidence is strong enough for pregnant women to be cautioned by health professionals against [acetaminophen's] indiscriminate use, both as a single ingredient and in combination with other medications."[3] Other researchers have subsequently reviewed the medical and scientific literature, finding that "prenatal exposure to [acetaminophen] causes statistically significant risks of developmental delays, attention deficit hyperactivity disorder, and a subtype of autism spectrum disorder (ASD) associated with hyperkinetic behavior."[4]

7.     Defendants have paid no heed to the scientific facts. They continue to promote Tylenol products' safety to pregnant women and children. They have taken no steps to update their labels to warn of these risks. Defying the recommendations of our Nation's public-health officials, Defendants practically encourage women to disregard the warnings of the Secretary of Health and Human Services and the Commissioner of Food and Drugs.

8.     There are many examples of drugs regulated by the Food and Drug Administration that include complete information regarding risks on their labels even when the underlying science—unlike here—is not fully settled. These labels reflect the aims of the regulatory system, which recognizes States' authority to require warnings to inform consumers of certain risks.

---

[3]     Ann Z. Bauer et al., *Paracetamol Use During Pregnancy—A Call for Precautionary Action*, 17 Nat. Rev. Endocrinol. 757, 764 (2021).

[4]     Esha Patel et al., *The Safety of Pediatric Use of Paracetamol (Acetaminophen): A Narrative Review of Direct and Indirect Evidence*, 74 Minerva Pediatr. 774, 774 (2022).

Copy from re:SearchTX

Pregnant women should be provided with complete information so that they can make informed decisions regarding the risks to which they expose their unborn children.

9.      But Defendants deprived pregnant women of the right to make that choice. Texas women relied on Defendants' Tylenol labels when deciding to consume Tylenol while pregnant. Had these labels contained any warning of acetaminophen's ASD/ADHD risk, pregnant women would have reduced or eliminated acetaminophen consumption while pregnant, preventing scores of Texas children from developing incurable neurodevelopmental disorders. At a minimum, Texas women were entitled to be informed about the true state of the science regarding acetaminophen so that they could make their own informed decisions about the true value of acetaminophen and whether to take it while pregnant.

10.     Defendants had the authority and the duty to change the warning labels of Tylenol products based on the significant scientific evidence, but chose not to.

11.     Similarly, Defendants failed to notify parents of the risk that giving their young children Tylenol could lead to ASD and ADHD.

12.     Defendants continue to breach their duties under Texas law with every Tylenol product sold without warning about the increased ASD/ADHD risks associated with product use, ensuring that future mothers and children will receive devastating diagnoses.

13.     Defendants have, however, recognized the liability of selling Tylenol products without an appropriate warning. Several years ago, Johnson & Johnson realized the risk that it was facing from lawsuits nationwide and decided to shed the liability.

14.     Johnson & Johnson transferred its liabilities associated with Tylenol to Kenvue. This was designed to shield Johnson & Johnson's assets from claimants who successfully sue

Copy from re:SearchTX

because children develop ASD and/or ADHD after their mothers ingested Tylenol during pregnancy. Johnson & Johnson also wanted to shield its assets from state enforcement lawsuits like this one.

15. The transfer of liabilities from Johnson & Johnson to Kenvue without also transferring sufficient assets to cover the liabilities is something Johnson & Johnson does frequently. It recently tried this tactic *three times* after it faced large verdicts because its talc powder caused cancer in women. Each time, its efforts were rebuffed. *See generally, e.g.*, *In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023).

16. Kenvue also played a role in the fraudulent transfer involving talc liability. Kenvue now holds all liability for talc claims outside the United States and Canada.[5]

### DISCOVERY CONTROL PLAN

17. The discovery in this case is intended to be conducted under Level 3 pursuant to Texas Rule of Civil Procedure 190.4. This case is not subject to the restrictions of expedited discovery under Texas Rule of Civil Procedure 169 because the State's claims include a claim for non-monetary injunctive relief and claims for monetary relief, including penalties and attorneys' fees and costs, in excess of $250,000, and the claims are within the jurisdictional limits of the Court.

### PARTIES

18. Plaintiff is The State of Texas, by and through the Consumer Protection Division of the Office of the Texas Attorney General.

---

[5] Esther Addley, *Thousands to Sue Johnson & Johnson in UK Over Alleged Talc Link to Cancer*, Guardian (Feb. 4, 2025), https://www.theguardian.com/business/2025/feb/04/johnson-and-johnson-uk-lawsuit-alleged-talcum-powder-link-to-cancer [https://perma.cc/QME4-WNWK].

Copy from re:SearchTX

19.     Defendants are entities that designed, manufactured, marketed, distributed, labeled, packaged, and/or sold Tylenol.

20.     Johnson & Johnson is a New Jersey corporation with its principal place of business in New Jersey. At all relevant times, Johnson & Johnson was engaged in the business of researching, developing, manufacturing, formulating, marketing, testing, promoting, licensing, selling, and/or distributing Tylenol. At all relevant times, Johnson & Johnson regularly transacted, solicited, and conducted business in Texas.

21.     Kenvue Inc. is a Delaware corporation with its principal place of business in New Jersey. Since its formation, Kenvue Inc. has engaged in the business of manufacturing, formulating, marketing, testing, promoting, licensing, selling, and/or distributing Tylenol. Since its formation, Kenvue Inc. regularly transacted, solicited, and conducted business in Texas.

22.     Kenvue Brands LLC is a wholly owned subsidiary of Kenvue Inc. Since its formation, Kenvue Brands LLC has engaged in the business of manufacturing, formulating, marketing, testing, promoting, licensing, selling, and/or distributing Tylenol. Since its formation, Kenvue Brands LLC has regularly transacted, solicited, and conducted business in Texas.

23.     Kenvue Inc. was incorporated on February 23, 2022, as a wholly owned subsidiary of Johnson & Johnson in connection with a restructuring of Johnson & Johnson's consumer health business. Kenvue Inc. and Johnson & Johnson entered into a separation agreement on May 3, 2023, and Kenvue Inc. completed its initial public offering as a standalone public company that same month. Johnson & Johnson continued to be the majority shareholder of Kenvue Inc. until at least August 2023, and Johnson & Johnson did not fully divest from Kenvue Inc. until mid-2024.

Copy from re:SearchTX

24.     Further, upon information and belief, Kenvue assumed all liabilities relating to the operation or conduct of Kenvue's business—including Tylenol—during all relevant times.

## JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction over this action. *See* Tex. Const. art. V, § 8.

26.     This Court may exercise personal jurisdiction over Defendants because they do business in Texas and the acts complained of relate to that business in Texas. *See* Tex. Civ. Prac. & Rem. Code § 17.042.

27.     Venue of this suit is proper in Panola County under section 17.47(b) of the DTPA because Defendants have done business in Panola County, and under section 15.002(a)(1) of the Texas Civil Practices and Remedies Code because a substantial part of the events and omissions given rise to the claims in this Petition occurred in Panola County.

## PUBLIC INTEREST

28.     The State has reason to believe that Defendants have engaged in, and will continue to engage in, the unlawful practices set forth below; that Defendants have, by means of these unlawful acts and practices, caused damage to and acquired money or property from persons; and that Defendants adversely affected the lawful conduct of trade and commerce, thereby directly and indirectly affecting Texans. Therefore, the Consumer Protection Division of the Office of the Attorney General of the State of Texas believes and is of the opinion that these proceedings are in the public interest.

Copy from re:SearchTX

## TRADE AND COMMERCE

29.     Defendants have, at all times described below, engaged in conduct that constitutes "trade" and "commerce" as those terms are defined in section 17.45(6) of the DTPA.

## ACTS OF AGENTS

30.     Whenever in this Petition it is alleged that Defendants did any act, it is meant that Defendants performed or participated in the act, or that their officers, agents, or employees performed or participated in the act on behalf of and under the authority of Defendants.

## FACTUAL ALLEGATIONS

A.     <u>**Johnson & Johnson's Predecessor Develops Acetaminophen Products.**</u>

31.     Acetaminophen was first discovered in the latter half of the 19th century. In the early 1950s, Robert McNeil—a graduate of Yale University and the Philadelphia College of Pharmacy and Science—led the research department at his family's small drug company. At a drug-industry conference, he found out about acetaminophen, which had been sold as a headache remedy in other countries.[6]

32.     McNeil Laboratories capitalized on the bubbling concern over aspirin's side effects—upset stomachs, ulcers, and impairment of normal blood clotting—to launch acetaminophen as a safe and effective alternative for treating pain and fever.

33.     In 1955, McNeil Laboratories—an entity that would later become part of the Johnson & Johnson pharmaceutical empire—obtained FDA approval and began distributing a

---

[6]     Stephen Miller, *Creator of Tylenol "For Little Hotheads"*, Wall St. J. (May 26, 2010), https://www.wsj.com/articles/SB10001424052748704026204575266780552207418 [https://perma.cc/9M83-3XCE].

9

Copy from re:SearchTX

branded single-ingredient product called Tylenol Elixir for Children, an aspirin-free pain reliever and fever reducer. Its active ingredient was acetaminophen.[7]

34.     The brand name "Tylenol" was a derivative of a combination of letters found in the chemical name for acetaminophen: N-aceTYL-p-aminophENOL.[8]

35.     Tylenol was marketed directly to physicians and pharmacists and, at the time, was available by prescription only. McNeil Laboratories' initial strategy was to offer Tylenol as a remedy for children, and it sold the drug in a package modeled after a fire engine along with a slogan pitching the product "for little hotheads."[9] By 1960, the drug was available without a prescription and was marketed for use by children and adults alike.[10]

36.     Since that time, acetaminophen has become one of the most widely used drugs in the world.

37.     A 2006 survey found that acetaminophen was the most used drug among adults in the United States, with 19% of adults reporting that they used the drug during a particular week.[11] Johnson & Johnson's July 2013 earnings call reported that McNeil's over-the-counter drug revenue had skyrocketed by 26%, identifying Children's Tylenol as one of the top two brands in over-the-counter children's pain relief.[12] The same call reported that Extra Strength Tylenol had

---

[7]     Natasha Singer, *Robert L. McNeil Jr., Chemist Who Introduced Tylenol, Dies at 94*, N.Y. Times (June 3, 2010), https://www.nytimes.com/2010/06/04/business/04mcneil.html [https://perma.cc/4Y5F-523Z].

[8]     McNeil Consumer Healthcare Company, *History of TYLENOL*, http://www.nancywest.net/pdfs/ McNeilConsumerHealthcareCompany.pdf [https://perma.cc/C6TC-PP65].

[9]     Miller, *supra* note 6.

[10]    Singer, *supra* note 7.

[11]    Slone Epidemiology Ctr. at Bos. Univ., *Patterns of Medication Use in the United States* 1 (2006), https://www.bu.edu/slone/files/2012/11/SloneSurveyReport2006.pdf [https://perma.cc/SX6U-WXUC].

[12]    *Use Only as Directed*, ProPublica (Sept. 20, 2013), https://www.propublica.org/article/Tylenol-mcneil-fda-use-only-as-directed [https://perma.cc/DFZ4-3JL7**]**.

Copy from re:SearchTX

doubled its market share during the first half of 2013, cementing its status as America's No. 1 over-the-counter adult pain reliever.[13]

38.     Acetaminophen has long been marketed as the safest over-the-counter pain-relieving and fever-reducing treatment available for pregnant women.[14] In the United States, acetaminophen is estimated to be used by up to 65% of women during pregnancy.[15]

## B.     Johnson & Johnson Manufactures and Sells Tylenol and Has Control Over the Product, Distribution, Labeling, Marketing, and Advertising.

39.     Johnson & Johnson has sold and marketed Tylenol since 1959, when it acquired McNeil Laboratories.

40.     From at least 1970 until 2015, McNeil-PPC, Inc., a wholly owned subsidiary of Johnson & Johnson, designed, manufactured, packaged, labeled, marketed, sold and/or distributed Tylenol.

41.     In 2015, McNeil-PPC, Inc. merged with several other Johnson & Johnson companies and became Johnson & Johnson Consumer Inc. ("JJCI").

42.     Until 2023, JJCI designed, manufactured, packaged, labeled, marketed, sold and/or distributed Tylenol.

43.     In May 2023, Johnson & Johnson separated its consumer health business, including Tylenol, into a standalone public company called Kenvue Inc.

---

[13]  *Id.*

[14]  Am. Coll. of Obstetricians & Gynecologists, *ACOG Response to Consensus Statement on Paracetamol Use During Pregnancy*, ACOG.org (Sept. 29, 2021) https://www.acog.org/news/news-articles/2021/09/response-to-consensus-statement-on-paracetamol-use-during-pregnancy [https://perma.cc/5Y5T-78NE] ("ACOG and obstetrician-gynecologists . . . have always identified acetaminophen as one of the only safe pain relievers for pregnant individuals during pregnancy.").

[15]  *See* Bauer, *supra* note 3 at 758.

Copy from re:SearchTX

44. Since that date, Kenvue Inc. and its subsidiary Kenvue Brands LLC have designed, manufactured, packaged, labeled, marketed, sold and/or distributed Tylenol.

45. At all relevant times, and since at least 1970, Johnson & Johnson has designed, manufactured, packaged, labeled, marketed, and/or distributed Tylenol in conjunction with McNeil-PPC, Inc., McNeil Consumer Products Company, JJCI, and Kenvue.

46. Based on information and belief, Johnson & Johnson has maintained and exercised ultimate control over Tylenol, including over the labeling and marketing of Tylenol at all relevant times hereto and since at least 1970. Control over Tylenol, including the labeling and marketing, transferred to Johnson & Johnson's standalone affiliate, Kenvue.

47. The Tylenol products that are the subject of this action consist of those products with acetaminophen as the sole active ingredient.

## C.    ASD and ADHD Are Serious Neurodevelopmental Disorders.

48. ASD is a serious neurological disorder that typically manifests its symptoms early in childhood and can require lifelong care.[16]

49. Although the symptoms of ASD are wide-ranging, they generally include aberrant behavior and difficulty with social interaction and communication.[17] Many children with ASD also suffer from intellectual disability, with an IQ score below 70, and/or ADHD.[18]

50. The American Psychiatric Association previously provided five possible diagnoses for autistic conditions, ranging from Asperger's syndrome on the milder end to autistic disorder

---

[16]    *See Autism*, World Health Org. (Sept. 15, 2025), https://www.who.int/news-room/factsheets/detail/autism-spectrum-disorders [https://perma.cc/SVM4-C6QL].

[17]    *Id.*

[18]    Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 58–59 (5th ed. 2013); *see also* CDC, *Autism & Developmental Disabilities Monitoring (ADDM) Network—Community Report on Autism 2021* 10, 48 (2021), https://www.cdc.gov/ncbddd/autism/media/pdfs/addm-community-autism-report/-12-2-021_final-h.pdf [https://perma.cc/QB48-FUBZ] ("2021 Autism Report").

Copy from re:SearchTX

on the severe end.[19] The current edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") provides for a single diagnosis, Autism Spectrum Disorder, with three levels of severity.[20]

51. Children with Level 1 ASD, the mildest form, require some support in daily life.[21] These children can often speak in full sentences but still have trouble initiating social interactions, reading nonverbal cues, and engaging in back-and-forth conversation.[22] Making friends might not come easily, and an inflexibility of behavior can make it difficult to switch between activities.[23] These children might also experience problems with organization and planning that limit their independence.[24]

52. Children with Level 2 ASD require substantial support in daily life.[25] These children have more obvious problems with communication, often speaking in simple sentences and struggling with nonverbal communication.[26] They also tend to have narrow interests and to engage in odd, repetitive behaviors, which further limits their social interactions and their ability to function in various contexts.[27]

53. Children with Level 3 ASD, the severest form, require very substantial support in daily life.[28] These children have significant difficulty expressing themselves and will often be entirely nonverbal.[29] They might interact with others only in response to direct approaches.

---

[19] Am. Psychiatric Ass'n, *supra* note 18 at 51.
[20] *Id.* at 52.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] Am. Psychiatric Ass'n, *supra* note 18 at 52.
[27] *Id.*
[28] *Id.*
[29] *Id.*

Copy from re:SearchTX

And they will exhibit extreme inflexibility, engaging in repetitive behaviors and feeling great distress when changing focus, which impedes their ability to function in everyday situations.[30]

54.　　ASD can be reliably diagnosed by age two and is sometimes detectable earlier.[31] Diagnosis is based on observation; there is no medical test for ASD.[32] Many children are diagnosed after age four.[33]

55.　　ASD can go undiagnosed until much later in life, even into adulthood.[34]

56.　　Treatments for ASD include varying degrees of behavioral management therapy, cognitive behavior therapy, joint attention therapies, physical therapy, speech-language therapy, occupational therapy, social skills training, and medication.[35]

57.　　Treatment for ASD lasts a lifetime, and there is no cure for the condition.[36]

58.　　One report estimates that, as of 2018, 2.3% of eight-year-old Americans, or 1 in 44, have ASD.[37]

59.　　The World Health Organization estimates that about 1% of children have ASD worldwide, making childhood autism over two times more prevalent in the United States than the global average.[38]

60.　　Since 2013, ASD has appeared alongside ADHD and other neurodevelopmental disorders in the DSM-5 in a new chapter titled "Neurodevelopmental Disorders."

---

[30] *Id.*

[31] *Id.* at 55; 2021 Autism Report, *supra* note 18 at 36.

[32] 2021 Autism Report, *supra* note 18 at 19.

[33] *Id.* at 9–10.

[34] *See generally* Steven D. Stagg & Hannah Belcher, *Living with Autism Without Knowing: Receiving a Diagnosis in Later Life*, 7 Health Psychol. Behav. Med. 348 (2019).

[35] Laura C. Politte et al., *Evidence-Based Treatments for Autism Spectrum Disorder*, 2 Curr. Treat. Options Psychiatry 38 (2015).

[36] *Autism*, World Health Org., *supra* note 16.

[37] *See* 2021 Autism Report, *supra* note 18 at 6.

[38] *See Autism*, World Health Org., *supra* note 16.

Copy from re:SearchTX

61. Like ASD, ADHD is a neurological disorder that typically begins in childhood, persists through adulthood, and has become more prevalent among American children over time.[39]

62. There is overlap between the symptoms of ASD and ADHD, and the DSM-5 categorizes the symptom patterns that emerge as either ASD, ADHD, or comorbid ADHD and ASD.

63. ASD and ADHD share a pathophysiology in the biological pathways that dysregulate neurodevelopment and create brain variations leading to disorder onset.

**D.** **Acetaminophen Use by Pregnant Women Leads to Children With ASD and ADHD.**

64. For years, the scientific evidence has shown that acetaminophen can cause ASD and ADHD in children whose mothers ingested the drug while pregnant and that the more acetaminophen ingested, the greater the risk.

65. Parental awareness and changes in diagnoses do not account for the rapid rise in ASD and ADHD diagnoses, or for the higher prevalence in the United States as compared to the rest of the world.[40]

66. One article noted that "a country's average prenatal [acetaminophen] consumption was found to be correlated with its autism/ASD prevalence" with an R of 0.80, which suggests a strong correlation.[41]

---

[39] *See About Attention-Deficit/Hyperactivity Disorder (ADHD)*, Ctrs. for Disease Control & Prevention (Oct. 23, 2024), https://www.cdc.gov/adhd/about/?CDC_AAref_Val=https://www.cdc.gov/ncbddd/adhd/facts.html [https://perma.cc/RGU4-M7QW].

[40] William Shaw, *Evidence That Increased Acetaminophen Use in Genetically Vulnerable Children Appears to Be a Major Cause of the Epidemics of Autism, Attention Deficit with Hyperactivity, and Asthma*, 2 J. Restor. Med. 14, 14 (2013).

[41] Ann Z. Bauer & David Kriebel, *Prenatal and Perinatal Analgesic Exposure and Autism: An Ecological Link*, 12 Environ. Health 1, 4 (2013).

Copy from re:SearchTX

67.     Another study noted that "the marked increase in the rate of autism [and] attention deficit with hyperactivity . . . may be largely caused by the marked increase in . . . the use of acetaminophen by pregnant women."[42]

68.     Since 2013, scientists examining over 70,000 mother-child pairs in at least six European birth cohort studies have shown an association between prenatal use of acetaminophen and ASD and ADHD.

69.     A birth cohort study follows a group of people that were born around the same time. By following a group over time and collecting information at regular intervals, a birth cohort study gives the study authors particular insight into how variables, including prenatal exposures to chemicals, affect children as they age.

70.     In a 2013 study, scientists undertook an expansive sibling-controlled analysis of 48,631 children from the Norwegian Mother and Child Cohort Study whose mothers had returned a three-year follow up questionnaire.[43] Between 1999 and 2008, all pregnant Norwegian women were eligible to participate in the study, and 38.7% of pregnant women participated.[44] The study population included 2,919 same-sex sibling pairs who were used to adjust for familiar and genetic factors.[45] During the study, the mothers submitted two questionnaires around gestational weeks seventeen and thirty reporting their medication use during the pregnancy and a follow-up questionnaire three years post-birth.[46] The study cohort was also linked to the Medical Birth Registry of Norway, which contained detailed medical information regarding the child.[47]

---

[42]    Shaw, *supra* note 40 at 14.
[43]    Ragnhild Eek Brandlistuen et al., *Prenatal Paracetamol Exposure and Child Neurodevelopment: A Sibling-Controlled Cohort Study*, 42 Int. J. Epidemiol. 1702, 1702 (2013).
[44]    *Id.* at 1703.
[45]    *Id.*
[46]    *Id.*
[47]    *Id.*

Copy from re:SearchTX

71.     The study authors concluded that acetaminophen "use for more than 28 days during pregnancy was associated with adverse outcomes for gross motor and communication development, behavior, and activity at 3 years of age. In contrast, [they] found no association between ibuprofen on the same neurodevelopmental outcomes, which suggests a specific effect of [acetaminophen] less likely to be confounded by indication."[48] "In clinical terms, the[ ] results suggest that exposure to [acetaminophen] for more than 28 days during foetal life increases the risk of adverse psychomotor and behavioral outcomes by almost 70% and doubles the risk of language problems in 3-year-old children."[49] Ultimately, the authors concluded that "[c]hildren exposed to long-term use of [acetaminophen] during pregnancy had substantially adverse developmental outcomes at 3 years of age."[50]

72.     In 2014, a peer-reviewed, prospective study found that acetaminophen use during pregnancy was associated with a higher risk for ADHD.[51] For the study, the authors conducted three telephone interviews with the mothers (two during pregnancy and one six months after birth) and administered a standardized behavioral questionnaire to the caregiver when the child was seven years old.[52] Notably, the study detected a statistically significant dose-response relationship, a critical feature of a causal relationship: "[s]tronger associations were observed with use in more than 1 trimester during pregnancy, and exposure response trends were found with increasing frequency of acetaminophen use during gestation for all outcomes."[53]

---

[48]   *Id.* at 1710.
[49]   *Id.* at 1711.
[50]   *Id.* at 1702.
[51]   Zeyan Liew et al., *Acetaminophen Use During Pregnancy, Behavioral Problems, and Hyperkinetic Disorders*, 168 JAMA Pediatr. 313, 313 (2014).
[52]   *Id.* at 314.
[53]   *Id.* at 313.

Copy from re:SearchTX

73. The authors concluded that by "[u]sing prospective data from a well-designed large cohort of pregnant women with a long duration of follow-up and registry-based outcome assessment, [they] found that prenatal exposures to acetaminophen may increase the risk in children of" having ADHD "with higher use frequency increasing risk in an exposure-response manner."[54]

74. Another observational birth cohort study—this one from New Zealand—further solidified the causal relationship between acetaminophen and ADHD.[55] The prospective study[56] examined use during pregnancy of acetaminophen, aspirin, antacids, and antibiotics in relation to behavioral difficulties and ADHD symptoms at ages seven and eleven by parent reporting and "found that the children of mothers who used Acetaminophen during pregnancy were at increased risk of having symptoms of ADHD" and that their "findings strengthen the contention that acetaminophen exposure in pregnancy increases the risk of ADHD-like behaviors."[57] Notably, the study found that there was "no association" between ADHD and the numerous other examined drugs used during pregnancy, including aspirin, antacids, and antibiotics.[58]

75. In 2016, another peer-reviewed study focused on 1,491 mothers/children enrolled in the Danish National Birth Cohort and prospectively recorded prenatal use of acetaminophen and then assessed executive function when the children reached five years old.[59] The study

---

[54] *Id.* at 319.
[55] John M.D. Thompson et al., *Associations Between Acetaminophen Use During Pregnancy and ADHD Symptoms Measured at Ages 7 and 11 Years*, 9 PLoS One 1 (2014).
[56] *Id.* at 1.
[57] *Id.* at 4.
[58] *Id.*
[59] Zeyan Liew et al., *Paracetamol Use During Pregnancy and Attention and Executive Function In Offspring at Age 5 Years*, 45 Int. J. Epidemiol. 2009 (2016).

Copy from re:SearchTX

concluded that "[t]he risks for subnormal overall attention or executive function were elevated with longer duration of [acetaminophen] use during pregnancy."[60]

76.    Later in 2016, scientists published a second peer-reviewed study focused on the Danish National Birth Cohort, which followed 64,322 children and mothers for an average of 12.7 years and obtained data regarding prenatal acetaminophen use during phone interviews during the twelfth and thirtieth gestational week and six months after birth.[61] That study "found prenatal exposures to acetaminophen to be associated with elevated risk for ASD with hyperkinetic features."[62]

77.    That same year, scientists published a prospective, confounder adjusted study of a Spanish birth cohort consisting of 2,644 mother-child pregnancy pairs to examine the causal association between acetaminophen and ASD and ADHD.[63] The scientists collected information regarding prenatal use of acetaminophen prospectively by interviewing the pregnant mothers at twelve and thirty-two gestational weeks.[64] All children were evaluated in-person by trained psychologists, computer-based measures, teacher-rated scales and specific symptom diagnostic tools for ADHD and ASD symptoms.[65] The results showed prenatal use of acetaminophen was associated with greater risk of ASD in males and showed a greater risk of ADHD in both sexes.[66]

---

[60]  *Id.*

[61]  Zeyan Liew et al., *Maternal Use of Acetaminophen During Pregnancy and Risk of Autism Spectrum Disorders in Childhood: A Danish National Birth Cohort Study*, 9 Autism Res. 951 (2016).

[62]  *Id.* at 956.

[63]  Claudia B. Avella-Garcia et al., *Acetaminophen Use in Pregnancy and Neurodevelopment: Attention Function and Autism Spectrum Symptoms*, 45 Int. J. Epidemiol. 1987 (2016).

[64]  *Id.* at 1989.

[65]  *Id.* at 1988–94.

[66]  *Id.*

Copy from re:SearchTX

The authors noted that "[t]hese associations seem to be dependent on the frequency of exposure [to acetaminophen]."[67]

78.     Yet another study published the same year assessed the association between acetaminophen and neurodevelopmental disorders while addressing confounding factors such as genetics.[68] This study consisted of 14,541 pregnant women from the Avon Longitudinal Study of Parents and Children cohort in Bristol, England.[69] Maternal acetaminophen use was measured at eighteen and thirty-two weeks of pregnancy.[70] Behavioral symptoms were collected by the mother's completing the Strengths and Difficulties Questionnaire, a child behavior screening questionnaire, when the child was seven years old.[71] "In this study [the authors ] demonstrated that children exposed prenatally to acetaminophen in second and third trimesters are at increased risk of multiple behavioral difficulties, including hyperactivity and conduct problems."[72]

79.     In 2017, a study using the Norwegian Mother and Child Cohort Study also assessed the association between prenatal use of acetaminophen and ADHD while accounting for genetic factors.[73] The final sample included 112,973 children and their parents.[74] The study sent questionnaires at eighteen weeks of gestation, later months of pregnancy, and after delivery.[75] The study then followed up with the children at six months old, eighteen months old, and three years old.[76] Even adjusting for confounders, the study found that "[l]ong-term maternal use of

---

[67]   *Id.* at 1988.
[68]   *See* Evie Stergiakouli et al., *Association of Acetaminophen Use During Pregnancy with Behavioral Problems in Childhood: Evidence Against Confounding*, 170 JAMA Pediatr. 964 (2016).
[69]   *Id.* at 965.
[70]   *Id.*
[71]   *Id.* at 965–66.
[72]   *Id.* at 967.
[73]   *See* Eivind Ystrom et al., *Prenatal Exposure to Acetaminophen and Risk of ADHD*, 140 Pediatrics 1 (2017).
[74]   *Id.* at 1.
[75]   *Id.* at 2.
[76]   *Id.*

Copy from re:SearchTX

acetaminophen during pregnancy is associated with ADHD in offspring."[77] "After adjusting for familial risk for ADHD, indications of use, and acetaminophen use before pregnancy," the study found that "long-term acetaminophen use during pregnancy is related to more than a twofold increase in risk for offspring ADHD."[78]

80.    In 2018, a Swedish pregnancy cohort study assessed prenatal acetaminophen exposure and language development in children at thirty months.[79] The study focused on delayed language development because it "is an early marker of impaired cognitive development."[80] Acetaminophen exposure was measured by maternal self-reporting and acetaminophen concentration in a urine sample taken at study enrollment.[81] The study showed a statically-significant language delay in girls whose mothers reported taking more than six tablets. There was also a statically significant difference between females whose mothers' acetaminophen use was in the highest versus lowest quartile.[82] The authors concluded that "[g]iven the prevalence of prenatal [acetaminophen] use and the importance of language development, these findings, if replicated, would suggest that pregnant women should limit their use of this analgesic during pregnancy."[83]

81.    In 2020, scientists published a study using data from the Boston Birth Cohort.[84] To avoid any potential limitations of relying on self-reporting, the study measured acetaminophen in

---

[77]    *Id.* at 7.
[78]    *Id.* at 1.
[79]    Carl-Gustaf Bornehag et al., *Prenatal Exposure to Acetaminophen and Children's Language Development at 30 Months*, 51 Eur. Psychiatry 98 (2018).
[80]    *Id.* at 99.
[81]    *Id.* at 98–99.
[82]    *Id.* at 99.
[83]    *Id.* at 98.
[84]    Ji, *supra* note 2.

Copy from re:SearchTX

maternal cord plasma samples obtained within one to three days postpartum.[85] The authors divided the cord groups into three groups or "tertiles" based on "acetaminophen burden." "Compared with being in the first tertile, being in the second and third tertiles of cord acetaminophen burden was associated with higher odds of ADHD diagnosis . . . and ASD diagnosis."[86] Study participants with the top third levels of acetaminophen in cord plasma suffered a 3.62 times increased risk of giving birth to a child later diagnosed with ASD and a 2.86 times increased risk of giving birth to a child later diagnosed with ADHD.

82.     The study's authors further noted that "[s]ensitivity analyses and subgroup analyses found consistent associations between acetaminophen and ADHD and acetaminophen and ASD across strata of potential confounders, including maternal indication, substance use, preterm birth, and child age and sex."[87] Finally, the authors concluded that their "findings support previous studies regarding the association between prenatal and perinatal acetaminophen exposure and childhood neurodevelopmental risk and warrant additional investigations."[88]

83.     Another peer-reviewed study published in 2020 avoided maternal self-reporting or incomplete information regarding the quantity of acetaminophen ingested by analyzing the child's meconium.[89] This approach allowed the study's authors to reliably know the baby's exposure to acetaminophen prior to birth because the exposure level can be measured in the first feces of a newborn infant.[90] Besides the meconium analysis, this study tracked the children to assess whether

---

[85]   *Id.* at 181.
[86]   *Id.* at 180.
[87]   *Id.* at 183.
[88]   *Id.* at 188.
[89]   Brennan H. Baker et al., *Association of Prenatal Acetaminophen Exposure Measured in Meconium with Risk of Attention-Deficit/Hyperactivity Disorder Mediated by Frontoparietal Network Brain Connectivity*, 174 JAMA Pediatr. 1073 (2020).
[90]   *Id.* at 1074.

Copy from re:SearchTX

there was a physician diagnosis of ADHD and undertook an MRI analysis of each study participant at nine to eleven years old.[91] Compared with no acetaminophen, detection of acetaminophen in meconium was associated with a statically-significant increased risk of ADHD.[92] Notably, a dose-response association was detected; each doubling of exposure increased the odds of ADHD by 10%.[93] Children with acetaminophen detected in meconium also showed brain development problems.[94]

84.     These "results suggest[ed] that prior studies may have been biased toward the null by inaccurate maternal recall."[95] In other words, past studies may have had a bias toward there not being an association when in fact there may be an association, meaning that those prior studies may have understated the association between acetaminophen and ADHD.[96]

85.     The epidemiologic evidence is fortified by consistent animal studies, neuroscience studies, and empirical evidence that demonstrate viable biologic mechanisms by which acetaminophen causes ASD and ADHD and impactful real-world effects.[97] This consistent epidemiologic, animal, neuroscience, and empirical evidence has led independent physicians and scientists to demand that women be warned about the dangerous effects acetaminophen can have on their unborn children.

---

[91]  *Id.* at 1075.
[92]  *Id.* at 1073.
[93]  *Id.*
[94]  *Id.*
[95]  *Id.* at 1079.
[96]  *Id.*
[97]  Stephen Schultz et al., *Endocannabinoid System Dysregulation from Acetaminophen Use May Lead to Autism Spectrum Disorder: Could Cannabinoid Treatment Be Efficacious?*, 26 Molecules 1845 (2021).

Copy from re:SearchTX

86. Based on the overwhelming scientific evidence, in September 2021 over ninety scientists signed a consensus statement calling for precautionary action over the use of acetaminophen during pregnancy.[98]

87. The scientists issued this "call to action" because of the serious safety concerns of continued acetaminophen use by pregnant women given the overwhelming evidence that acetaminophen use during pregnancy causes ASD and ADHD.[99] The authors concluded that "the combined weight of animal and human scientific evidence is strong enough for pregnant women to be cautioned by health professionals against its indiscriminate use, both as a single ingredient and in combination with other medications."[100]

88. The signatories of the consensus statement are highly respected and diverse. They work all over the world and include professors in the fields of public health, neurology, biostatistics, molecular biology, epidemiology, molecular and reproductive toxicology, endocrinology, pediatrics, embryology, translational medicine, physiology, obstetrics, and reproductive medicine.[101]

89. These distinguished professionals came together because the "disturbing increases in the number of children with cognitive, learning and/or behavioural problems" will continue to happen if women are not warned of acetaminophen's risks.[102]

90. Following the publication of the consensus statement, additional research has continued to confirm the association between prenatal acetaminophen and neurodevelopmental

---

[98]  *See* Bauer, *supra* note 3 at 763.
[99]  *Id.* at 762–63.
[100] *Id.* at 764.
[101] *Id.* at supp. materials.
[102] *Id.* at 757.

Copy from re:SearchTX

disorders. In 2025, researchers used the Navigation Guide Systematic Review methodology—a gold-standard framework for synthesizing and evaluating environmental health data—to conduct a comprehensive analysis of the forty-six human observational studies that had been performed on this topic to date.[103] Their analysis found that higher-quality studies were more likely to show positive associations between acetaminophen use and neurodevelopmental disorders, further supporting a causal relationship between acetaminophen exposure during pregnancy and increased incidence of neurodevelopmental disorders.[104]

91. Although more research has been done on the effects that acetaminophen has on children in utero, there have also been studies done that examine whether giving acetaminophen to young children causes ASD. The results are sobering. As one scientist said, the rise in autism rates in America coinciding with the recommendation not to give children aspirin "seems unlikely to be artifact or coincidence."[105]

92. Another study suggested that "the use of acetaminophen may trigger autism by activating the endocannabinoid system thereby interfering with normal development. Children who are poor metabolizers of acetaminophen may be at higher risk since normal therapeutic doses may lead to higher blood levels in these children."[106]

## E. Defendants Engage in Deceptive Trade Practices by Not Warning of Tylenol's Dangers.

93. Despite this overwhelming evidence, Defendants have taken no steps to warn pregnant women of the dangers associated with taking acetaminophen while pregnant.

---

[103] Diddier Prada et al., *Evaluation of the Evidence on Acetaminophen Use and Neurodevelopmental Disorders Using the Navigation Guide Methodology*, 24 Environ. Health No. 56 (2025).
[104] *Id.*
[105] Peter Good, *Did Acetaminophen Provoke the Autism Epidemic?*, 14 Altern. Med. Rev. 364, 370 (2009).
[106] Stephen T. Shultz, *Can Autism Be Triggered by Acetaminophen Activation of the Endocannabinoid System?*, 70 Acta Neurobiol. Exp. (Wars) 227, 229 (2010).

Copy from re:SearchTX

94. Similarly, Defendants have not warned of the dangers of young children taking Tylenol.

95. Defendants have represented to Texas consumers that they take affirmative steps to ensure the safety of their over-the-counter products, and consumers rely on those safety representations.

96. Following the publication of the 2013 Norwegian Mother and Child Cohort Study,[107] a spokesperson for Johnson & Johnson said Tylenol "has an exceptional safety profile. As the authors note in the study, there are no prospective, randomized controlled studies demonstrating a causal link between acetaminophen use during pregnancy and adverse effects on child development."[108] A randomized control study is exceedingly rare for a pregnant study population, so the Johnson & Johnson spokesperson sought to undermine the 2013 study by pointing to a lack of scientific evidence she knew would never exist.[109] Moreover, once the risk of neurodevelopmental disorders was identified, performing a randomized controlled study would be unethical.

97. As evidence of a causal link between acetaminophen and neurodevelopment disorders grew, Johnson & Johnson's senior executives reviewed new studies and directed a communications strategy to create doubt about their conclusions.

98. For example, in response to the 2014 article in JAMA Pediatrics, Johnson & Johnson's senior leadership controlled the messaging strategy for pushback by Johnson &

---

[107] Brandlistuen, *supra* note 43.

[108] Kathryn Doyle, *Too Much Tylenol in Pregnancy Could Affect Development*, Reuters (Nov. 22, 2013), https://www.reuters.com/article/us-too-much-tylenol-in-pregnancy-could-a/toomuch-tylenol-in-pregnancy-could-affect-development-idUSBRE9AL15920131122 [https://perma.cc/VEZ3-GCYG].

[109] *Id.*

Copy from re:SearchTX

Johnson's and JJCI's global communications and regulatory groups. The article found that "[c]hildren whose mothers used acetaminophen during pregnancy were at higher risk for receiving a hospital diagnosis of [hyperkinetic disorder]."[110]

99. The evidence was so alarming it went to high-level executives at Johnson & Johnson, including the CEO.

100. Johnson & Johnson's pushback strategy continued after publication of the 2016 JAMA Pediatrics study,[111] with Johnson & Johnson's senior executives again directing Johnson & Johnson's and JJCI's messaging to undermine the study.

101. That pattern continued in 2018 when Johnson & Johnson's global communications team again led the effort to undermine the Bornehag study,[112] steering the media to the Consumer Healthcare Products Association, "the national trade association representing the leading manufacturers and marketers of consumer healthcare products,"[113] for reaction on the part of Johnson & Johnson and JJCI.

102. In 2021, Johnson & Johnson was still controlling the messaging around acetaminophen's risks, with senior executives leading the pushback to a May 2021 article,[114] including bringing in Johnson & Johnson's senior epidemiology team to assist in developing the communications strategy for Johnson & Johnson and JJCI.

---

[110]  Liew, *supra* note 51.
[111]  Stergiakouli, *supra* note 68.
[112]  Bornehag, *supra* note 79.
[113]  Press Release, Consumer Healthcare Prod. Ass'n, CHPA Welcomes 41 New Consumer Healthcare Manufacturer and Associate Members (Mar. 15, 2024), https://www.chpa.org/news/2024/03/chpa-welcomes-41-new-consumer-healthcare-manufacturer-associate-members [https://perma.cc/NU74-Q8DP].
[114]  Silvia Alemany et al., *Prenatal and Postnatal Exposure to Acetaminophen in Relation to Autism Spectrum and Attention-Deficit and Hyperactivity Symptoms in Childhood: Meta-Analysis in Six European Population-Based Cohorts*, 36 Eur. J. Epidemiol. 993 (2021).

Copy from re:SearchTX

103.    In addition to Johnson & Johnson's communications strategy to undermine studies supporting a causal link between acetaminophen and neurological disorders, Johnson & Johnson controlled the messaging to pregnant women through a popular and trusted parenting site, BabyCenter, which it owned from 2001 to 2019.[115]

104.    During a 2018 Johnson & Johnson earnings call, JJCI's global chief marketing officer described BabyCenter as "an incredible asset" featuring "the largest online parenting community in the world." According to Johnson & Johnson, "[w]e have 7 out of 10 moms in 14 countries around the world that sign up for BabyCenter at 5 weeks of pregnancy." This control of the pregnant and new mom demographic allowed Johnson & Johnson to "leverag[e] the data of BabyCenter to really make it an engine behind how we connect and give mom what she wants when she wants it."

105.    On information and belief, Johnson & Johnson used BabyCenter to promote Tylenol as safe to use during pregnancy under the guise that it was coming from a neutral party—Babycenter.com—and not the maker of Tylenol. For example, the website included information from a "genetic counselor" that acetaminophen was safe to take during pregnancy despite the studies above linking prenatal use of acetaminophen to neurodevelopmental disorders.

106.    Based on information and belief, Johnson & Johnson's highest executives were engaged in the misconduct and cover-up regarding prenatal use of Tylenol and neurodevelopmental disorders, including ASD and ADHD.

---

[115] Bloomberg News, *Johnson & Johnson Buys BabyCenter from eToys*, N.Y. Times (Mar. 3, 2001), https://www.nytimes.com/2001/03/03/business/company-news-johnson-johnson-buysbabycenter-from-etoys.html [https://perma.cc/T798-JDCQ]; *Everyday Health Group Acquires BabyCenter, the Leading Global Digital Parenting Resource*, Nasdaq (Aug. 27, 2019), https://www.nasdaq.com/pressrelease/everyday-health-group-acquires-babycenter-the-leading-global-digital-parenting [https://perma.cc/25YV-KCEX].

Copy from re:SearchTX

107.    Defendants' pattern of deflection and silence has continued to the present day. None has taken any steps to warn pregnant women of the dangers associated with taking acetaminophen while pregnant.

108.    For example, a Defendant ran this advertisement, "Mother's Day: Celebrating the Moms Who Care Without Limits," and reinforced its message that Tylenol is safe for pregnant women:



109.    Defendants have the ability and the duty to update the Tylenol label to ensure that it provides adequate warnings to consumers.

110.    Although Tylenol labels warn of various risks, nothing on the Tylenol label warns pregnant women that ingestion of acetaminophen while pregnant can cause ASD and/or ADHD. Similarly, there is no warning that infants or young children taking the drug could cause ASD and/or ADHD.

111.    An example Tylenol label is:

Copy from re:SearchTX



112. Drug marketers, like Defendants, have voluntarily added warnings of other risks on numerous occasions based on much less conclusive evidence than that pleaded above.

113. For example, Defendants have voluntarily added a skin allergy warning to their Tylenol labels based on the FDA's informal guidance. That guidance is based on much less conclusive scientific evidence than that which shows acetaminophen causes ASD and ADHD.

114. The FDA has recognized that marketers have a duty to warn the public about a drug's potential dangers, even if the underlying science is not conclusive. That makes sense. Consumers ingesting a drug designed to treat minor aches, pains, and fever have a right to make

Copy from re:SearchTX

an informed choice about possible risks they are willing to bear, even if those risks have not been established with scientific certainty.

115.    The body of scientific evidence showing a causal relationship between ASD/ADHD and prenatal ingestion of acetaminophen is overwhelming, consisting of at least twenty-six observational studies with over 170,000 people, and further corroborating animal studies. Given this compelling scientific evidence, it is incumbent on Defendants to use their labels to warn pregnant women that the drug can cause ASD and ADHD. Or at a minimum, they should warn pregnant women that many studies have found such an association. Yet Defendants have taken no steps to warn pregnant women of the dangers associated with prenatal ingestion of Tylenol. Instead, Defendants have continued marketing these products as completely safe for pregnant women.

**F.    Defendants Take Steps to Mislead Texas Consumers About the Dangers of Tylenol.**

116.    For years, Defendants have represented acetaminophen as FDA Pregnancy Category B. This matters because Category B means a drug has shown no risk to the fetus in animal studies, whereas Category C drugs have shown risk in animal studies and risk cannot be ruled out in humans.

117.    Defendants described acetaminophen as Category B on their publicly accessible website targeting health professionals, TylenolProfessional.com.

118.    FDA has never assigned over-the-counter acetaminophen to any category.

119.    The only acetaminophen that FDA did assign to a pregnancy category was an injectable acetaminophen, which was placed in the more dangerous Category C.

Copy from re:SearchTX

120.    But because of Defendants' misrepresentations, healthcare professionals and consumers have falsely believed Tylenol is a safe pain reliever for pregnant women—indeed, the only safe pain reliever for pregnant women.

121.    After Defendants were sued because of Tylenol's link to ASD and ADHD, they began funding research about Tylenol's risk to pregnant women and young children.

122.    Defendants' research did not take an even-handed approach designed to uncover the truth. Rather, Defendants code-named the initiative Project Cocoon to explain why Tylenol's label should not be changed.

123.    To reach this preordained conclusion, Defendants engaged long-established friends of the pharmaceutical industry, including ChemRisk, the firm infamously behind the "reanalysis" of data showing that chromium in California drinking water caused cancer—the litigation of Erin Brockovich fame—and which proclaimed EPA got it all wrong on the risks of secondhand smoke.[116]

124.    To date, Defendants have not substantively investigated Tylenol's risks. Rather, they just pay for pro-Tylenol literature to be put in the public domain under the guise of "science."

125.    Still, even Defendants' self-serving review of the preclinical evidence refers to the potential risk of adverse neurodevelopmental outcomes.[117]

126.    This is unsurprising. Defendants did an internal assessment of the evidence and concluded—back in 2014—that the evidence implied a causal relationship between acetaminophen and ASD/ADHD.

---

[116] David Michaels, *Doubt Is Their Product: How Industry's Assault on Science Threatens Your Health* 52 (1st ed. 2008).
[117] Daniel G. Kougias et al., *A Quantitative Weight-of-Evidence Review of Preclinical Studies Examining the Potential Developmental Neurotoxicity of Acetaminophen*, Crit. Rev. Toxicol. (2025).

Copy from re:SearchTX

127.    By 2017, Defendants changed their internal label to warn that acetaminophen "should not be used during pregnancy" in some situations because of the "possible risks" of neurodevelopmental disorders like ASD and ADHD.

128.    In 2018, Defendants' lead epidemiologist opined that "the weight of the evidence" linking acetaminophen to ASD "is starting to feel heavy."

129.    Defendants deliberately chose never to share this information with Texas consumers.

**G.    Johnson & Johnson Ignores Evidence Showing Prenatal and Early-Childhood Acetaminophen Use Causes ASD While Directing a Subsidiary to Study ASD Causes and Profits from That Research.**

130.    Johnson & Johnson's actions suggest that it prioritizes profits for shareholders over the interests of all other stakeholders.

131.    Based on information and belief, Johnson & Johnson has directed its subsidiary, Janssen Research & Development, LLC ("Janssen"), to track ASD behaviors and other events.

132.    Janssen operates the Janssen Autism Knowledge Engine ("JAKE"), which is a "system of tools and technologies to optimize clinical trials for . . . ASD."[118] The JAKE system was developed to facilitate the testing of medications that may treat the symptoms of ASD.

133.    "JAKE is a dynamically updated clinical research system developed to provide quantifiable and reproducible measures for use in assessing treatment outcomes, potentially including detection of change in ASD symptoms and ASD subgroup identification. JAKE is a three-part investigational system consisting of: My JAKE (a web and mobile application for use by caregivers and clinicians to log symptoms, record treatments, track progress, and gather

---

[118] Gahan J. Pandina, *Symposium 47.4 Development of a System of Tools and Technologies to Optimize Clinical Trials for Autism Spectrum Disorders*, 55 J. Am. Acad. Child Adolesc. Psychiatry S334, S334 (2016).

Copy from re:SearchTX

comprehensive medical information); JAKE Sense (research biosensors and tasks designed to detect and monitor changes in experimental, proof-of-concept ASD biomarkers); and JAKE Stream (a system designed to collect, time-synchronize, and process data from both My JAKE . . . and JAKE Sense . . .)."[119]

134.     Through the My JAKE web-and-mobile application, a user can "log symptoms, demarcate events of interest, record treatments and medical information, and track overall study progress" for someone with ASD.[120] This data is collected and stored in the "Janssen Research Data Warehouse," where Janssen can analyze that data along with data collected from JAKE Sense biosensors.[121]



[119]  Seth L. Ness et al., *An Observational Study with the Janssen Autism Knowledge Engine (JAKE®) in Individuals with Autism Spectrum Disorder*, 13 Front. Neurosci. 4 (2019).
[120]  *Id.* at 5.
[121]  Seth L. Ness et al., *JAKE® Multimodal Data Capture System: Insights from an Observational Study of Autism Spectrum Disorder*, 11 Front. Neurosci. 2 (2017).

Copy from re:SearchTX

135.     Based on information and belief, for many years, dating back to at least 2015 and continuing today, Janssen, at the direction of Johnson & Johnson, has been tracking ASD patients throughout the United States and perhaps globally via My JAKE. Janssen collects the following data via My JAKE:

- ABI (Autism Behavior Inventory):[122] The ABI is based on sixty-five questions answered by the My JAKE user (typically, the caregiver for the person with ASD) related to the core and associated symptoms of ASD.[123]

- ABI-S: A shorter version of the ABI.[124]

- Daily Tracker: Reports on the quality of sleep the previous night for the person with ASD and the user's observation of three ASD behaviors tracked daily.[125]

- Mood Report: Reports on the user's observation of the mood of the person with ASD in terms of "emotional valence and energy levels."[126]

- Journal and Event Trackers: Shows a log of events with descriptions that are meant to be recorded contemporaneously by the user. The user may enter this data in a journal style or choose from a list of common ASD events.[127]

---

[122]  The ABI scale measures changes in core and associated symptoms in both children and adults with ASD. *See* Abi Bangerter et al., *Autism Behavior Inventory: A Novel Tool for Assessing Core and Associated Symptoms of Autism Spectrum Disorder*, 27 J. Child. Adolesc. Psychopharmacol. 814 (2017). ABI allows measurement of social communication, restrictive repetitive behaviors, mental health, self-regulation, and challenging behavior. *Id.* at 819–20.

[123]  Sarah Bonneux, *Janssen Autism Knowledge Engine (Jake®) System In Autism Spectrum Disorder* 3–4, https://www.cdisc.org/sites/default/files/2021-02/2020_eu_interchange_paper_sbonneux_28       feb.pdf [https://perma.cc/3FLH-GV5K].

[124]  *Id.*

[125]  *Id.*

[126]  *Id.* at 4.

[127]  *Id.*

Copy from re:SearchTX

- Therapy Tracker: Shows a log of care-related appointments, such behavioral, occupational, and speech therapy appointments, of the person with ASD, which can be displayed in weekly or monthly views.[128]

- Medical/Developmental History: Shows a detailed medical history and developmental history of the person with ASD.[129]

136.    These data are reflected in the My JAKE user interface, as shown below:[130]



FIGURE 2 | Sample My JAKE home page. ABA, Applied behavior analysis.

137.    Janssen also tracks data from a mother's pregnancy:

---

128    *Id.*
129    *Id.*
130    Ness, *supra* note 119 at 7.

Copy from re:SearchTX



138.     Although Janssen tracks pregnancy data through its My JAKE application, at the direction of Johnson & Johnson, Janssen does not track whether mothers of children with ASD took Tylenol—or other acetaminophen products—while pregnant. Based on information and belief, Johnson & Johnson directs Janssen to not track this information and purposefully fails to include prenatal use of acetaminophen as a data point for JAKE. Meanwhile, JAKE contains a "therapy tracker" module, which allows for the "tracking of participants' medical treatments or therapies, using a calendar-like interface."[131]

139.     For Janssen to collect health-related data concerning children with ASD, Janssen created the "My JAKE Data Pipeline," through which health records stored in a caregiver's or participant's Microsoft HealthVault account would be uploaded. After capturing these health records, data is directed to an internal Janssen server for traceability archiving/auditing and then ultimately to the Janssen data management team.

---

[131]  *Id.* at 6.

Copy from re:SearchTX

140.     The My JAKE application has been touted as a tool to "test[] pharmaceutical compounds [in the near future] for the treatment of [ASD]." [132] Johnson & Johnson seeks to use JAKE to profit off the very ASD epidemic Johnson & Johnson, through JJCI, helped create by marketing pharmaceutical treatments while willfully continuing to turn a blind eye to the fact that its signature product, Tylenol, can cause ASD in children.

141.     On information and belief, following the publication of numerous scientific journal articles concerning the association between prenatal use of acetaminophen and ASD, Defendants set out on a course to obscure the published science.

142.     On information and belief, given that Johnson & Johnson and JJCI apparently chose to protect their brand rather than turning to the participating parents, caregivers, and health professionals to assess whether children with ASD who are monitored within the JAKE "Data Pipeline" were exposed to Tylenol while in utero, JJCI and Johnson & Johnson could only have been left with the ability to study a limited collection of post-marketing adverse events reported concerning acetaminophen. However, it is believed that within all adverse events reported relative to acetaminophen, only a handful of adverse events reported involved children with claimed ASD.

143.     On further information and belief, the efforts to rebuke and downplay the science that shows prenatal use of Tylenol can cause ASD and/or ADHD has been a collective effort by Johnson & Johnson, Janssen, and JJCI.

---

[132] Nanette Varian, *Meet the Man Who's Helping to Advance Autism Research*, Johnson & Johnson (Oct. 23, 2016), https://www.jnj.com/innovation/janssen-autism-spectrum-disorder-research    [https://perma.cc/FY7M-ZR7Q].

Copy from re:SearchTX

## H.  Johnson & Johnson Engages in a Fraudulent Transfer to Shield Itself from Liability.

144.    Upon information and belief, Johnson & Johnson knew that claims linked to Tylenol causing ASD and ADHD could potentially subject it to billions of dollars in liability.

145.    On November 12, 2021, Johnson & Johnson began the process of "peeling off" its consumer health business, including Tylenol.[133] As one analyst noted, "if the consumer division 'no longer holds the deep pockets of the combined company, the risk of future consumer product litigation . . . may decrease.'"[134]

146.    In 2022, dozens of lawsuits were filed against acetaminophen sellers around the country regarding the neurodevelopmental harms caused by prenatal use of acetaminophen. The claims in federal court were consolidated into a multidistrict litigation on October 5, 2022.

147.    On April 24, 2023, Johnson & Johnson announced that it planned to take Kenvue Inc. public.[135] When the initial public offering closed on May 8, 2023, Johnson & Johnson held "approximately 89.6% of the total outstanding shares of Kenvue [Inc.] common stock[,]" with the "intention to dispose of its majority stake in Kenvue [Inc.]" later that year.[136] The initial public offering was "partial consideration for the consumer health business that Johnson & Johnson transferred to Kenvue. [Inc.]"[137] Tylenol was part of that transfer.

---

[133]   Michelle Chapman & Tom Murphy, *Johnson & Johnson to split into 2, aim for faster growth*, Associated Press (Nov. 12, 2021), https://apnews.com/article/business-johnson-and-johnsonhealth-prescription-drugs-be49e5beca59dfcb3457be62f4cfa2e9 [https://perma.cc/ZAD2-J8AW].

[134]   *Id.*

[135]   Press Release, Johnson & Johnson, Johnson & Johnson Announces Launch of Kenvue Inc. IPO Roadshow (Apr. 24, 2023), https://www.jnj.com/media-center/press-releases/johnson-johnson-announces-launch-of-kenvue-inc-ipo-roadshow [https://perma.cc/NJ9E-M9UH].

[136]   Press Release, Kenvue Inc., Kenvue Announces Closing of Initial Public Offering (May 8, 2023), https://investors.kenvue.com/financial-news/news-details/2023/Kenvue-Announces-Closing-of-Initial-Public-Offering/default.aspx [https://perma.cc/9WBU-HQ9X].

[137]   *Id.*

39

Copy from re:SearchTX

148.     On August 23, 2023, Kenvue Inc. "announced its separation from Johnson & Johnson, marking its first day as a fully independent company."[138] By the time Kenvue Inc. announced it was separating, Johnson & Johnson had only "9.5% of the outstanding shares of Kenvue [Inc.] common stock."[139] On May 13, 2024, Kenvue Inc. announced that Johnson & Johnson would sell off its remaining stake.[140]

## I.     The Department of Health and Human Services Rejects Defendants' Scientific Spin.

149.     On September 22, 2025, the United States Department of Health and Human Services "initiate[d] a safety label change" about chronic acetaminophen use in pregnant women.[141]

150.     This action was in response "to prior clinical and laboratory studies that suggest a potential association between acetaminophen use during pregnancy and adverse neurodevelopmental outcomes."[142]

151.     As HHS recognized, "large-scale cohort studies, including the Nurses' Health Study II and the Boston Birth Cohort, report associations between in utero exposure [to acetaminophen] and later diagnoses of autism spectrum disorder (ASD) and attention-deficit/hyperactivity disorder (ADHD)."[143]

---

[138]  Press Release, Kenvue Inc., Kenvue Becomes a Fully Independent Company Following Final Separation from Johnson & Johnson (Aug. 23, 2023), https://investors.kenvue.com/financial-news/news-details/2023/Kenvue-Becomes-a-Fully-Independent-Company-Following-Final-Separation-from-Johnson--Johnson/default.aspx [https://perma.cc/JH4Q-E7UN].

[139]  Id.

[140]  J&J to Exit Spinoff Kenvue with Latest Stake Sale, Reuters (May 13, 2024), https://www.reuters.com/markets/deals/jj-sell-all-shares-spun-off-unit-kenvue-2024-05-13/ [https://perma.cc/2E7J-2EMY].

[141]  Press Release, U.S. Dep't of Health & Human Servs., President Trump, Secretary Kennedy Announce Bold Actions to Tackle Autism Epidemic (Sept. 22, 2025), https://www.hhs.gov/press-room/hhs-trump-kennedy-autism-initiatives-leucovorin-tylenol-research-2025.html [https://perma.cc/5KSF-9BM9].

[142]  Id.

[143]  Press Release, U.S. Dep't of Health & Human Servs., Autism Announcement Fact Sheet, https://www.hhs.gov/press-room/autism-announcement-fact-sheet.html [https://perma.cc/A4CF-EUCT].

Copy from re:SearchTX

152.    Moreover, "[s]cientists have proposed biological mechanisms linking prenatal acetaminophen exposure to altered brain development."[144]

153.    "Because acetaminophen is one of the most common medications taken during pregnancy, even a modest increase in risk could have a significant public health impact."[145]

154.    HHS thus sent a letter to doctors nationwide warning them that "evidence has accumulated suggesting that the use of acetaminophen by pregnant women may be associated with an increased risk of neurological conditions such as autism and ADHD in children."[146]

155.    HHS acted because Defendants failed to properly warn physicians and consumers about the risks associated with pregnant women using acetaminophen.

156.    The evidence cited by HHS was in Defendants' possession for years and they refused to act on it. Rather, they engaged in deceptive trade practices and fraudulently transferred assets.

157.    When announcing this action, President Trump, Health and Human Services Secretary Robert F. Kennedy, Jr., and Commissioner of Food and Drugs Martin Makary all made clear that this regulatory action was supported by ample scientific evidence.

158.    As President Trump noted, "since 2000, autism rates have surged by much more than 400 percent." He noted that the federal government was "strongly recommending that women limit Tylenol use during pregnancy unless medically necessary. That's, for instance, in cases of extremely high fever." He repeatedly urged pregnant women that they should not take

---

[144]    *Id.*

[145]    *Id.*

[146]    Martin A. Makary, M.D., M.P.H., Commissioner of Food and Drugs, Notice to Physicians on the Use of Acetaminophen During Pregnancy (Sept. 22, 2025), https://www.fda.gov/media/188843/download [https://perma.cc/S5VV-49VC].

Copy from re:SearchTX

acetaminophen unless absolutely necessary. And he also made clear that acetaminophen should not be reflexively given to children "after the baby is born," either. None of this information had previously been provided to pregnant women by Defendants, via Tylenol labels, packaging, in-store merchandising, advertisements, or any other methods.

159.    As Secretary Kennedy noted, the federal government was "responding to clinical and laboratory studies that suggest[] a potential association between acetaminophen use during pregnancy and adverse neurodevelopmental outcomes, including later diagnosis for ADHD and autism." He made clear that the government had "evaluated the contrary studies that show no association" but nevertheless decided to "issue a physician's notice about the risk of acetaminophen during pregnancy," "begin the process to initiate a safety label change," and "launch a nationwide public service campaign to inform families and protect public health." None of this had been done previously by Defendants.

160.    Secretary Kennedy also addressed many of the arguments made by Defendants during the many years in which they concealed the true risk. For example, Defendants and their allies have routinely suggested that the meteoric rise in autism rates is being driven by changed diagnostic criteria and greater awareness about autism. Secretary Kennedy made clear that this is simply a "canard[] that has been promoted by the industry for many years"—a canard promoted by these Defendants in particular. As Secretary Kennedy pointed out, "there's been study after study done of that, that completely debunks that."

161.    Commissioner of Food and Drugs Martin Makary stated that "we now have data we cannot ignore," highlighting the very studies discussed above. He acknowledged that "you'll be able to find a study to the contrary," but emphasized that this was simply "how science works."

Copy from re:SearchTX

He quoted with approval Andrea Baccarelli, Dean of the Harvard School of Public Health, for the proposition that "there is a causal relationship between prenatal acetaminophen use and neurodevelopmental disorders of ADHD and autism spectrum disorder." Again, none of this had been previously disclosed to pregnant women.

## CAUSES OF ACTION

### Count I — DTPA Violations (All Defendants)

162.     The State re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

163.     The State may bring an action against a person when it has reason to believe the person is engaging in an act or practice declared unlawful under the DTPA. Tex. Bus. & Com. Code § 17.47(a).

164.     The DTPA prohibits all false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.

165.     Defendants are "persons" as defined by the Tex. Bus. & Com. Code § 17.45(3).

166.     Defendants have, while engaged in trade and commerce, engaged in false, misleading, and deceptive acts and practices declared unlawful by sections 17.46(a) and (b) of the DTPA, including, but not limited to:

a.    Representing, directly or by implication, that Tylenol does not pose a risk to children when their mothers consume the drug while pregnant;

b.    Representing, directly or by implication, that Tylenol does not pose a risk to young children who consume the drug;

43

Copy from re:SearchTX

c. Representing, directly or by implication, that it is safe for pregnant women to take Tylenol;

d. Representing, directly or by implication, that it is safe for young children to take Tylenol;

e. Representing, directly or by implication, that Tylenol is the safest drug for pregnant women who have a fever to take;

f. Representing, directly or by implication, that Tylenol is the safest drug for young children to take;

g. Representing, directly or by implication, that alternatives to Tylenol are more dangerous to pregnant women;

h. Failing to disclose information, including the risks associated with pregnant women taking Tylenol, which, if disclosed, would have caused pregnant women not to take the drug;

i. Failing to disclose information, including the risks associated with young children taking Tylenol, which, if disclosed, would have caused young children not to take the drug;

j. Representing, directly or by implication, that Johnson & Johnson's transfer of liabilities to Kenvue was non-fraudulent; and

k. Failing to disclose information, including the potential liability Johnson & Johnson faced because of Tylenol's link to ASD and ADHD, when transferring Johnson & Johnson's Tylenol liabilities and assets to Kenvue.

Copy from re:SearchTX

## Count II — UFTA Violations (All Defendants)

167.     The State re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

168.     The UFTA prohibits a debtor from transferring assets to prevent creditors from recovering the value of their or claim without receiving appropriate compensation for the assets.

169.     The UFTA prohibits a debtor from incurring a debt with the intent to hinder, delay, or defraud any creditor.

170.     The UFTA prohibits a debtor from incurring a debt without receiving reasonably equivalent value if the debtor knows, or reasonably should know, that it would incur debts beyond the debtor's ability to pay as the debts become due.

171.     The State is a creditor as that term is defined in the UFTA.

172.     Defendants are "debtors" as defined in the UFTA.

173.     The State has a "claim" as defined in the UFTA.

174.     Upon information and belief, Johnson & Johnson has known for many years that its Tylenol products could cause ASD and ADHD in children when their mothers consume the drug while pregnant.

175.     Upon information and belief, Johnson & Johnson has known for many years that its Tylenol products could cause ASD and ADHD in children when young children take the drug.

176.     Kenvue has known since it was formed that its Tylenol products could cause ASD and ADHD in children when their mothers consume the drug while pregnant.

177.     Kenvue has known since it was formed that its Tylenol products could cause ASD and ADHD in children when the drug is taken by young children.

45

Copy from re:SearchTX

178.    Further, possessed with this knowledge, upon information and belief, Defendants knew that the State would have legal claims against them for their actions surrounding the marketing, sale, and advertising of Tylenol in Texas.

179.    Upon information and belief, Johnson & Johnson knew that claims of this nature could potentially subject it to billions of dollars in liability.

180.    Johnson & Johnson incorporated JNTL, Inc., the company that would eventually be known as Kenvue Inc. on February 23, 2022, as a Delaware corporation.

181.    When the initial public offering for Kenvue Inc. closed on May 8, 2023, Johnson & Johnson held the vast majority of Kenvue Inc. common stock. By August 2023, Johnson & Johnson had divested its majority stake down to 9.5% of Kenvue Inc.'s common stock. In May 2024, Johnson & Johnson intended to divest this remaining stake.

182.    Upon information and belief, to protect itself from liability for claims like those at issue here, Johnson & Johnson transferred its Tylenol assets and liabilities to Kenvue

183.    This maneuver was a direct attempt by Johnson & Johnson to insulate itself from liabilities arising from consumer health products such as Tylenol by transferring its assets and liabilities to Kenvue. *See* Tex. Bus. & Com. Code § 24.005(a)(1).

184.    Kenvue incurred a debt intending to hinder, delay, or defraud creditors. *See* Tex. Bus. & Com. Code § 24.005(a)(1).

185.    Kenvue incurred a debt while it knew, or should have known, that it would incur debts beyond its ability to pay the debts as they become due. *See* Tex. Bus. & Com. Code § 24.005(a)(2)(B).

Copy from re:SearchTX

186.     This conduct is prohibited by the UFTA, regardless of whether Defendants intended this result and regardless of whether Defendants knew of the State's specific claims before the transfer.

187.     As a direct and proximate result of Defendants' actions, the State has been harmed in that it may be unable to recover full value for its claims.

## JURY TRIAL DEMAND

188.     The State requests a jury trial and tenders the jury fee to the Panola County District Clerk's Office pursuant to Texas Rule of Civil Procedure 216 and Tex. Gov't Code § 51.604.

## PRAYER

189.     The State prays that the Court enter judgment in its favor and, among other things:

a.   Enjoin Defendants from engaging in any deceptive or unfair trade practice related to the manufacturing, distributing, advertising, or selling of Tylenol in Texas;

b.   Order Defendants to destroy any marketing or advertising materials in their possession that represent, directly or indirectly, that Tylenol is safe for pregnant women and children or that Tylenol does not cause ASD/ADHD in children whose mothers take the drug during pregnancy or in young children who take the drug;

c.   Order Defendants to pay civil penalties to the State in the amount of $10,000 per DTPA violation;

d.   Order disgorgement of Defendants' assets, as provided by law and equity;

e.   Attach the assets of Johnson & Johnson equivalent to the value of the fraudulent transfer of its assets to Kenvue;

f.   Enjoin Defendants from disposing of other corporate assets;

Copy from re:SearchTX

g. Order Defendants to pay pre-judgment and post-judgment interest on all monetary awards, as provided by law;

h. Order Defendants to pay all court costs, investigatory costs, and the State's attorneys' fees, as provided by law; and

i. Grant the State such other relief which is proper and just.

Dated: October 27, 2025.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**RYAN WALTERS**
Deputy Attorney General for Legal Strategy

*/s/ Johnathan Stone*
**JOHNATHAN STONE**
Chief, Consumer Protection Division
Texas State Bar No. 24071779

**JERRY BERGMAN**
Deputy Chief, Consumer Protection Division
Texas State Bar No. 24081694

**KELLEY OWENS**
Assistant Attorney General
Texas State Bar No. 24118105

Consumer Protection Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711
Telephone: (512) 463-2185
Fax: (512) 473-8301
Johnathan.Stone@oag.texas.gov
Jerry.Bergman@oag.texas.gov
Kelley.Owens@oag.texas.gov

Ashley C. Keller (pro hac vice forthcoming)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
ack@kellerpostman.com

John J. Snidow (pro hac vice forthcoming)
John M. Masslon II (pro hac vice forthcoming)
Roseann R. Romano (pro hac vice forthcoming)
Keller Postman LLC
1101 Connecticut Ave. NW
Suite 1100
Washington, DC 20036
Telephone: (202) 918-1123

Copy from re:SearchTX

jj.snidow@kellerpostman.com
john.masslon@kellerpostman.com
roseann.romano@kellerpostman.com

**Counsels for the State of Texas**

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Missy Lord on behalf of Johnathan Stone
Bar No. 24071779
missy.lord@oag.texas.gov
Envelope ID: 107352439
Filing Code Description: Plaintiff's Original Petition (OCA) *
Filing Description: Plaintiff's Original Petition
Status as of 10/28/2025 9:08 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 10/27/2025 10:16:15 PM | SENT |
| Jerry Bergman | | jerry.bergman@oag.texas.gov | 10/27/2025 10:16:15 PM | SENT |
| Kelley Owens | | kelley.owens@oag.texas.gov | 10/27/2025 10:16:15 PM | SENT |
| Steva Christian | | steva.christian@oag.texas.gov | 10/27/2025 10:16:15 PM | SENT |
| Sue Jennings | | sue.jennings@oag.texas.gov | 10/27/2025 10:16:15 PM | SENT |
| Missy Lord | | Missy.Lord@oag.texas.gov | 10/27/2025 10:16:15 PM | SENT |